**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**CINDY BRONZENE,**

                                **Plaintiff,**

        **vs.**                                           **1:10-CV-00967**
                                                          **(MAD)**

**MICHAEL J. ASTRUE, Commissioner of**
**Social Security,**

                                **Defendants.**
_____

**APPEARANCES:**                          **OF COUNSEL:**

Cindy Bronzene
264 Warren Street
Apt. A
Glens Falls, New York 12801
*Plaintiff Pro Se*

Social Security Administration              Dennis J. Canning, Esq.
Office of Regional General Counsel          Special Assistant U.S. Attorney
Region II
26 Federal Plaza - Room 3904
New York, New York 10278
*Attorneys for Defendant*

**Mae A. D'Agostino, U.S. District Judge:**

### MEMORANDUM-DECISION AND ORDER

### INTRODUCTION

        Plaintiff Cindy Bronzene, brings the above-captioned action pursuant to 42 U.S.C. §

405(g), seeking a review of the Commissioner of Social Security's decision to deny her

application for disability insurance benefits ("DIB").

### PROCEDURAL BACKGROUND

On January 7, 2008, plaintiff filed an application for DIB benefits.  (Administrative Transcript at p. 67-69).[1]  Plaintiff was 51 years old at the time of the application.  Plaintiff completed two "Work Activity Reports - Employee" (Form SSA-821-BK). (T. 81-102).  In those reports, plaintiff provided her work history from 1956 until 1983 including her time spent in the Navy and Army, construction work, work as a shrimp peeler and car wash attendant.  (T. 86).  Based upon the submissions, the agency determined that plaintiff's last insured date was September 30, 1983. (T. 104).  Plaintiff claimed that she was disabled, beginning from her date of birth, December 21, 1956, due to a learning disability and mental impairments.  On March 4, 2008, plaintiff's application was denied and plaintiff requested a hearing by an ALJ which was held on July 23, 2009.  (T.13; 49-56).  Plaintiff was accompanied by a non-attorney representative.  On August 12, 2009, the ALJ issued a decision denying plaintiff's claim for benefits.  (T. 12). The Appeals Council denied plaintiff's request for review on June 25, 2010 making the ALJ's decision the final determination of the Commissioner. (T. 1-4).  This action followed.

**FACTS**

**I.     Evidence Relating to Period Prior to Expiration of Insured Status - September 30, 1983**

The record contains sparse information for the relevant time period.  In December 1975, plaintiff completed a Report of Medical History and denied any depression, excessive worry, loss of memory or nervousness.[2] (T. 260).  In January 1976, plaintiff completed another Report on Medical History and denied a history of any psychiatric care. (T. 265).  On May 12, 1977, plaintiff had a military physical and checked "normal" for psychiatric history. (T. 263).  In

---

[1]  "(T. )" refers to pages of the administrative transcript, Dkt. No. 14.

[2] The record does not indicate why plaintiff completed these forms.

August 1980, plaintiff completed a Medical Review and Orientation Form. (T. 256).  On the submission, plaintiff denied any psychiatric treatment or treatment for any mental condition.  Plaintiff was examined by Peter Cassella, M.D. who noted that plaintiff had no history of illegal drug use or emotional problems. (T. 257).   In August 1980, plaintiff completed a Report of Medical History for her enlistment with the Navy and denied any prior complaints relating to depression, loss of memory or nervousness. (T. 258).

The record also contains plaintiff's Secondary School Record Transcript from Corinth Central School. (T. 271).   Plaintiff ranked 76th out of 78 students in the class.  In March 1975, plaintiff was admitted to Adirondack Community College as a full-time student for the fall semester.  (T. 272).

## II.    Evidence After September 30, 1983

On February 16, 1990, plaintiff was evaluated at Saratoga County Medical Center upon referral from a social services worker with the Office of Vocational Rehabilitation ("OVR").  Plaintiff was referred "after inappropriate behaviors were displayed during an OVR appointment". (T. 278). Initially, plaintiff was evaluated by Coral Horner, a therapist and provided a long history of being unable to complete her goals or maintain employment.  Plaintiff acknowledged that she had problems with her memory and concentration. (T. 278).  Plaintiff suffered a head trauma at the age of three requiring surgery.  Plaintiff claimed that she was sexually active around age 13 while under the influence of alcohol and often "at group parties".  (T. 279).  Plaintiff completed high school and was briefly enrolled at Adirondack Community College.  (T. 279).  Plaintiff joined the Army but was honorably discharged due to marijuana possession.  Plaintiff served time in the Navy and held a variety of "low-functioning odd jobs".  Plaintiff denied any prior sexual or physical abuse. (T. 402).  Plaintiff denied any psychiatric

treatment or history, "other than a one time talk in high school with counselor - was referred by art teacher". (T. 278).  Ms. Horner suspected that plaintiff suffered sexual and emotional abuse at an early age and an adolescent history marked with alcohol use.

Ms. Horner referred plaintiff to Ivan Engel, M.D. for a psychiatric evaluation. (T. 418). Plaintiff presented in a "confused and 'spaced-out' condition" and was described as "depressed, overwhelmed and tearful".  Plaintiff denied any prior psychiatric history or any family psychiatric history. (T. 418).  Dr. Engel discussed plaintiff's "family social history" and noted, "[t]his was not well elaborated during our meeting".  Dr. Engel noted that Ms. Horner diagnosed plaintiff with post-traumatic stress disorder but concluded, "there is no indication that this is a correct diagnosis".  Dr. Engel deferred diagnosing plaintiff at that time.  (T. 419).  Plaintiff was advised to begin therapy with Ms. Horner but pharmacological treatment was postponed.

In April 1992, Dr. Engel diagnosed plaintiff with possible Tourettes Syndrome[3] and prescribed Haldol and Artane.[4] (T. 416).  Dr. Engel continued to treat plaintiff from 1992 through 1995 and consistently noted plaintiff was doing reasonably well and was "stable". (T. 411). Plaintiff was succeeding in school and in her work environment and interacting better with her daughter.  Dr. Engel also noted that the vocal ticks and abnormal movements which led to the tentative diagnosis of Tourette's were decreasing.   In June 1996, Dr. Engel examined plaintiff and found her "anxious" and "on the edge".  (T. 406).  Plaintiff felt Ms. Horner wanted to "terminate her case" and discussed some personal issues with a male friend recently diagnosed

---

[3] Tourette's Syndrome is a neurological disorder characterized by repetitive, stereotyped, involuntary movements and vocalizations called tics. http://www.nih.gov. (Last visited February 19, 2012).

[4] Haldol is an anti-psychotic drug.  http://www.ncbi.nlm.nih.gov (Last visited February 19, 2012).  Artane is used to treat the symptoms of Parkinson's disease and tremors caused by other medical problems or drugs.  *See id.*

with cancer.  Plaintiff also stated that she stopped taking Haldol.  Dr. Engel did not find plaintiff to be a danger to herself or anyone else and advised plaintiff that she should continue treating with Ms. Horner.  Plaintiff was prescribed Prozac.

The record contains voluminous records documenting plaintiff's visits with Ms. Horner. Plaintiff consistently treated with Ms. Horner from February 1990 through December 1997.  In August 1990, Ms. Horner completed a "Comprehensive Treatment Plan" noting that plaintiff recently revealed a history of extreme emotional neglect and sexual abuse by non-family members.  Ms. Horner suspected that this history contributed to plaintiff's failure at employment and schooling.  (T. 328).  In October 1992, Ms. Horner completed a "Treatment Plan" and diagnosed plaintiff with schizoid personality disorder.  (T. 344).  In February 1993, plaintiff was in school and increasing her course study at BOCES.  Plaintiff discussed the possibility of a referral for alcoholism services however, Ms. Horner did not push the suggestion due to plaintiff's overall improvement.  (T. 312).  In April 1993, Ms. Horner completed a treatment plan and concluded that while plaintiff progressed with 93 weeks of treatment, continued treatment was needed.  In July 1993, Ms. Horner noted that plaintiff was doing well after the death of her mother and living with her daughter in Corinth.  Plaintiff was working for the summer and enrolled in three college courses but continued intermittent alcohol use. (T. 307).  Plaintiff was compliant with Haldol.

During the time that she treated with Ms. Horner, Ms. Horner continually referenced plaintiff's history of abuse and neglect.  Throughout the course of treatment, plaintiff's interpersonal skills improved, she developed relationships, attended school, was gainfully employed and consistently progressed.

On December 17, 1997, Ms. Horner completed a Discharge Summary with a diagnosis of Tourette's Syndrome. (T. 277).   Ms. Horner noted that plaintiff was treated with a combination of medication, sheltered workshops and case management.  Plaintiff developed interpersonal relationships and was living with her male partner.  Plaintiff's case was closed as she was moving out of the county for a better school environment for her daughter.

On September 3, 2008, plaintiff's psychologist, Kimberly Brayton, J.D., Ph.D., provided a report regarding plaintiff's treatment. (T. 249).  Dr. Brayton noted that she began treating plaintiff on December 22, 2006 for symptoms including withdrawal, poor sleep/appetite, extreme feelings of guilt and low self worth.  Dr. Brayton noted that plaintiff's, "memory is very vague and quite confused.  She has been unable to provide any timeline of events or activities in any coherent fashion".  Dr. Brayton noted that plaintiff "alludes to being exposed to inappropriate sexual touching and behavior by various friends of her elder sister and neighbors".  Dr. Brayton opined, "it is unclear what happened to Ms. Bronzene when she was young".  However, the doctor continued, "she is quite responsible with obligations and commitments" and noted that plaintiff volunteers in a local nursing home, was a breast cancer survivor and works hard to help her daughter.

### III.    Plaintiff's Testimony at Administrative Hearing

On July 23, 2009, plaintiff testified before the ALJ at an administrative hearing.  (T. 20). Plaintiff testified that she was receiving SSI.[5]  (T. 22).  Plaintiff testified that she has no memory of going to school but claimed that when she was in eighth or ninth grade, she was raped by friends who were much older. (T. 26).  When asked if she had any medical treatment for the problems that she had in the 1960's and 1970's, plaintiff responded, "Absolutely not.  My parents

---

[5] On April 24, 1992, plaintiff applied and was approved for non-permanent disability benefits for schizophrenia, paranoia and other psychotic disorders.  (T. 73).

didn't refer to me to see anybody.  Nobody seemed to mind.  I had an art teacher that sent me up to the school psychologist." (T. 27).  Plaintiff testified that she could not find any record of that visit and the non-attorney representative indicated that she was only able to obtain plaintiff's school records from Corinth School.   The representative advised the ALJ that there were no written reports from the school psychologist. (T. 29).

## DISCUSSION

The Social Security Act (the "Act") authorizes payment of disability insurance benefits to individuals with "disabilities."  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To be eligible for DIB, plaintiff must establish that her disability commenced on or before the date her insured status expired.  42 U.S.C. §§ 423(a)(1)(A) and (c)(1); 20 C.F.R. § 404.131.  The plaintiff carries the initial burden of proving she is disabled within the meaning of the Act.  42 U.S.C. §§ 423(d) (5)(A); *see Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002).

There is a five-step analysis for evaluating disability claims:

> "In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do." The claimant bears the burden of proof on the first four steps, while the Social Security Administration bears the burden on the last step.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Draegert*, 311 F.3d at 472) (the plaintiff bears the burden through the first four steps of the analysis); *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000) (internal citations omitted).

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence."  42 U.S.C. § 405(g); *see also Shaw*, 221 F.3d at 131.  Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*  The Court may also set aside the Commissioner's decision when it is based upon legal error.  *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).

Here, the ALJ found at step one that plaintiff has not engaged in substantial gainful activity since the alleged onset date (date of birth), December 21, 1956 through September 30, 1983, the date last insured. (T. 14).  The parties do not dispute the ALJ's conclusion regarding the date that plaintiff was last insured.  The ALJ noted, "[a]lthough the claimant engaged in substantial gainful activity for a brief period, the Administrative Law Judge will continue the sequential evaluation to determine whether she had been under a disability any time during the relevant period". (T. 14).  At step two, the ALJ concluded that the objective medical evidence failed to establish the existence of a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms.  (T. 14).  Thus, the ALJ concluded the sequential analysis and found that plaintiff was not under a disability as defined by the Social Security Act. (T. 16).

Given plaintiff's *pro se* status, the Court will construe plaintiff's arguments in a light most favorable to her.  In seeking federal judicial review of the Commissioner's decision, plaintiff submitted three briefs/letters with exhibits. (Dkt. Nos. 13, 18 and 19)  The Court has accepted and

will consider all submissions and exhibits.  Plaintiff argues: (1) the ALJ failed to adequately develop the medical record and failed to issue subpoenas for relevant testimony; (2) the ALJ erred when he failed to order a consultative examination; (3) the ALJ's decision is not supported by substantial evidence; (4) a jury trial is necessary; and (5) the ALJ erroneously considered her claim as one for DIB when the claim was for Survivor Benefits. (Dkt. No. 13).

## I.   Duty to Develop Medical Record

The ALJ has an affirmative duty to develop the medical record if it is incomplete. *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999).  Where a claimant is unrepresented by counsel, "the ALJ is under a heightened duty 'to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.'" *Echevarria v. Sec'y of Health & Human Servs*., 685 F.2d 751, 755 (2d Cir. 1982).  This obligation involves, *inter alia*, the duty to ensure that the claimant secures all of the relevant medical testimony; the duty to call the claimant's physicians to testify; and the duty to instruct the claimant of his right to subpoena and cross-examine physicians. *Myers v. Astrue*, 2009 WL 2162541, at *2 (N.D.N.Y. 2009) (citations omitted). The ALJ must also enter the attempts at evidentiary development into the record.  *Id*.

"Where there are no obvious gaps in the administrative record, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim."  *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996)); *see also Rosa,* 168 F.3d at 79 (where the ALJ possesses a complete medical history, he is under no obligation to obtain additional information before rejecting a claim).  In cases such as this, under the SSA regulations, the ALJ has an affirmative duty to seek medical reports from plaintiff's treating sources prior to the date on which her disability insurance coverage expired.  *Pino v. Astrue*, 2010 WL 5904110, at *18 (S.D.N.Y. 2010).

In the decision, the ALJ discussed the record before him and his efforts to obtain additional information, "[v]arious attempts to obtain medical records prior to her date last insured for disability was unsuccessful or simply did not exist". (T. 15). The ALJ continued, "[a] review of the medical record shows that she was first treated for schizoid personality and depression in February 1990. There was no evidence that she received mental health treatment prior to this date". (T. 15).

### A.     Record of Treatment and Allege Impairments Prior to September 1983

The record clearly establishes, and plaintiff does not dispute, that she did not seek or obtain any treatment for any alleged mental impairments during the relevant period, 1956 through 1983. However, plaintiff vaguely asserts that her high school art teacher referred her to a school psychologist. On June 10, 2009, prior to the administrative hearing, the agency sent a letter to the Corinth Central School District requesting all of plaintiff's records from 1969 through 1975. (T. 147, 203). On June 15, 2009, the School District returned the correspondence stating, "No records on this student. Anything we had was already mailed". The ALJ discussed this issue:

> It was claimant's contention that she was disabled as a child secondary to childhood abuse and that she received counseling services through school. The claimant's representative attempted to get additional evidence to support her clients claim including school records.

The ALJ noted that some school records were received but found, "[t]here was nothing in those reports to show that she received counseling services or received special education services." (T. 15).

In further support of her claims regarding treatment with her school psychologist, plaintiff submitted exhibits to the complaint and brief. The first exhibit, a letter dated October 9, 2009 from Bruce E. Oudekerk, was attached as an exhibit to the complaint. Mr. Oudekerk was plaintiff's art teacher in the "late 70's" and states, "I do not specifically remember sending her

name to the psychologist's office but in all likelihood I did recommend intervention of some sort, in fact it is unlikely I did not. Given the time frame, I think it would have been Dr. Lloyd Murdock". On November 9, 2010, plaintiff submitted a letter in further support of her motion for judgment on the pleadings. (Dkt. No. 19). The letter asks the Court to "accept as new evidence", a letter dated October 24, 2010 from R. Lloyd Murdoch, Ph.D., a retired school psychologist. Dr. Murdoch states, "I cannot recall any particulars of our sessions and school records are no longer available". Based upon these submissions, any attempts to contact Mr. Oudekerk or Dr. Murdoch would be futile.

During the administrative hearing, the ALJ afforded plaintiff several opportunities to discuss her symptoms and treatment during the relevant time frame. *See Messina v. Astrue*, 2009 WL 4930811, at *7 (S.D.N.Y. 2009). Based upon the entire record, including the letters from Mr. Oudekerk and Dr. Murdoch, the Court finds that the ALJ adequately and completely developed the record with respect to plaintiff's medical history for the relevant time period.

**B.    Record of Plaintiff's Recent Medical Treatment**

The ALJ also discussed plaintiff's medical treatment after 1983. Plaintiff was first treated for alleged mental impairments at Saratoga County Mental Health in 1990. During the administrative hearing, plaintiff stated that she treated at Saratoga County Mental Health but that she could not obtain her records because she could not pay the copying fee. (T. 36). The ALJ obtained the name and spelling of the facility from plaintiff's representative and indicated that he would write to the Saratoga County Mental Health and obtain plaintiff's records. (T. 38). The ALJ obtained plaintiff's records from Saratoga County Mental Health and cited to those records in the decision. The ALJ also considered the report of plaintiff's treating psychologist, Dr. Brayton. Accordingly, there are no gaps in the medical record requiring additional development.

The ALJ also satisfied his duty to advise plaintiff of the importance of a complete medical record.  During the administrative hearing, plaintiff testified about her childhood and provided details of her troubled youth.  The ALJ was sympathetic to plaintiff's situation but explained the importance of medical records and evidence:

> Q.   I believe you that you went to see the psychologist.  You don't have to prove that.  The problem I have is I don't know what the psychologist found, because I don't have his report - or her report, whichever it was.  (T. 30).

Plaintiff stated that she had a terrible life and that she wanted the ALJ to speak with her sister.  The ALJ stated:

> Q.   See, you don't have to prove that.  I believe you.  You've already proven that to my satisfaction.  The problem that I have is to find you disabled - -
>
> A.   Paperwork.
>
> Q.   - - I need medical evidence.

The ALJ told plaintiff that he would consider any records that she wanted to provide in order to reach a decision and acknowledged that he had plaintiff's military and current medical records. (T. 31, 35).  Consequently, the Court finds that the ALJ satisfied his duty to develop plaintiff's entire medical record and sufficiently documented his efforts to obtain all records for both the relevant period and beyond.


### C.   Subpoenas for Testimony

Plaintiff also argues that the ALJ erred when he refused to issue subpoenas for testimony from various witnesses including her sister, former teachers and "people that abused her as a child".  The Court disagrees.  The ALJ was not required to employ his subpoena power.  "The use

of subpoenas in social security proceedings is governed primarily by 20 C.F.R. § 416.1450(d),

which provides, in pertinent part:

> When it is reasonably necessary for the full presentation of a case, an
> administrative law judge may, on his or her own initiative or at the
> request of a party, issue subpoenas for the appearance and testimony
> of witnesses and for the production of books, records, correspondence,
> papers, or other documents that are material to an issue at a hearing.

*Perez-Rodriguez v. Astrue*, 2011 WL 6413763, at *8 (S.D.N.Y. 2011) (citing 20 C.F.R. §

416.1450(d)(1)). "The plain language of this section clearly places the decision to issue a

subpoena within the sound discretion of the ALJ." *Id*. (citation omitted).  At an administrative

hearing, plaintiff does not have "the right to unfettered use of the ALJ's subpoena power".  *See*

*Friedman v. Astrue*, 2008 WL 3861211, at *9 (S.D.N.Y. 2008) (the Court refused to overturn the

ALJ's decision based on this argument).

        Here, plaintiff's proposed witnesses could not offer testimony relevant to the issue at

hand, to wit, whether plaintiff suffered from a medically determinable mental impairment in

1983.  The proposed testimony is not material to the issues before the ALJ at the hearing.  The

ALJ discussed this subject with plaintiff during the hearing:

> Q.    . . . But my art teacher that sent me is still alive.  And he would
>       probably know the name, maybe of the psychiatrist.  He can
>       attest that he sent me up.  And I was with him for a few years
>       for art classes and things.
>
> A.    Okay.  But, see, but it doesn't help me to have the art teacher
>       say he sent you to see the psychologist.  I'd have to know what
>       the psychologist found.  Do you understand what I mean? (T.
>       30).

        Accordingly, the Court finds that the ALJ acted within his discretion in this regard.

## II.    Duty to Order a Consultative Psychiatric Examination

The ALJ has the duty to order a consultative examination where the record establishes that such an examination is necessary to enable the ALJ to render a decision. *Serianni v. Astrue*, 2010 WL 786305, at *5 (N.D.N.Y. 2010) (citing 20 C.F.R. §404.1517). The regulations require that the ALJ must order a consultative examination when "[a] conflict, inconsistency, ambiguity or insufficiency in the evidence must be resolved". *Id.* (citing *Matejka v. Barnhart*, 386 F.Supp.2d 198, 208-09 (W.D.N.Y.2005) (citing 20 C.F.R. § 404.1519a(b)(4)); *see also Cruz v. Shalala*, 1995 WL 441967, at *5 (S.D.N.Y.1995) (holding that the right to a post-hearing consultative examination exists only where a claimant's medical sources cannot or will not provide sufficient medical evidence regarding impairment for a determination about whether the claimant is disabled). "If the evidence does not support work-related functional limitations resulting from the possible mental impairment, additional development, including review by a psychiatrist or psychologist is not necessary. *Haskins v. Comm'r of Soc. Sec.*, 2008 WL 5113781, at *7, n. 5 (N.D.N.Y. 2008).

As discussed, there is no evidence that plaintiff was ever treated for any psychological impairments during the relevant time period. Thus, there was no ambiguity or inconsistency in the medical evidence or testimony to warrant a consultative examination. The ALJ had all necessary information to reach a decision with regard to the severity of plaintiff's mental impairments between 1956 and 1983. The ALJ specifically discussed the issue of an independent consultation with plaintiff during the administrative hearing and adequately explained why such an examination would be futile:

> A.   Then you know what, then why can't the state hire a psychologist, and then talk to some of these people, and then be - - something from there?  You can't - -

> Q.   Well, we could hire a psychologist, but a psychologist that you saw today couldn't tell me what you were like in the 60's because he didn't know you in the 60's. (T. 33).

Based upon the medical record, the Court finds no error in the fact that the ALJ did not order a consultative psychiatric evaluation. *See Pierce v. Astrue*, 2010 WL 6184871, at *8 (N.D.N.Y. 2010) (the plaintiff had no history of psychological treatment or symptoms).

## II.   Substantial Evidence

Plaintiff argues that the ALJ's decision is not supported by substantial evidence.  The ALJ concluded the sequential analysis after Step Two noting that plaintiff did not demonstrate the existence of a medically determinable mental impairment.  A "severe" impairment is one that significantly limits an individual's physical or mental ability to do basic work activities. *Meadors v. Astrue*, 370 F. App'x 179, 182 (2d Cir. 2010) (citing 20 C.F.R. §§ 404.1520 ( c ), 416.920 ( c )).  The Regulations define "basic work activities" as the "abilities and aptitudes necessary to do most jobs," examples of which include,

> (1) Physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual work situations; and
> (6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b); see also Social Security Ruling 85-28, 1985 WL 56856, at *3-4, Titles II and XVI: Medical Impairments That Are Not Severe (S.S.A.1985).  Plaintiff has the burden at step two in the sequential evaluation process to demonstrate the severity of her impairment. *See* 20 C.F.R. § 404.1520 ( c ).  Evidence of an impairment that reached disabling severity after the expiration of an individual's insured status cannot be the basis for a disability determination, even though the impairment itself may have existed before the individual's insured status expired.

*Clobridge v. Astrue*, 2010 WL 3909500, at *2 (N.D.N.Y. 2010) (citation omitted).  A plaintiff's

failure to seek treatment is probative of the plaintiff's disability status during the time period in

question. *See Rose v. Barnhart*, 2003 WL 1212866, at *6 (S.D.N.Y. 2003).

> The ALJ found:

>> While the record reflects some low grades, the claimant successfully completed her courses and graduated from high school.  She was also able to attend college for two years which does not support a significant learning disability that would interfere with her ability to perform work related functions on a sustained basis prior to September 30, 1983. (T. 15).

>> *          *          *

>> Thus, regardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of medically determinable physical or mental impairments cannot be established in the absence of objective medical abnormalities such as medical signs and laboratory findings. (T. 15).

Upon review of the record, the Court finds that the ALJ's decision is supported by

substantial evidence.  Plaintiff argues that based upon her childhood experiences, she

undoubtedly suffered from  mental impairments.  The issue herein is not whether plaintiff

suffered from any mental impairments on or before September 1983, but whether plaintiff

suffered from a medically determinable impairment.  *See Roy v. Apfel*, 201 F.3d 432 (2d Cir.

1999).  During the relevant period, plaintiff graduated from high school and enrolled in a

community college.  Plaintiff was also accepted for enlistment in both the Army and Navy.

While the record contains ample evidence demonstrating that plaintiff has undergone extensive

treatment for mental impairments since 1990, plaintiff's treating physicians provide no opinion,

diagnosis or conclusions regarding plaintiff's mental health during the insured period.  Indeed,

records from plaintiff's therapist and Dr. Brayton reveal that plaintiff had difficulty remembering

details from her childhood and that "it is unclear what happened to her when she was young".

Upon a thorough review of the record, the Court found only one reference to the impact plaintiff's alleged childhood abuse may have had upon her attempts to sustain employment.  In August 1990, Ms. Horner referred to plaintiff's childhood and stated that "plaintiff recently revealed a history of extreme emotional neglect and sexual abuse by non-family members".  Ms. Horner "suspected that this history contributed to plaintiff's failure at employment and schooling".  Despite this statement, the ALJ was not obligated to seek a retrospective opinion from Ms. Horner because she a therapist and not a treating physician.  Moreover, Ms. Horner did not treat plaintiff during the relevant time frame.  In addition, the ALJ was not required to seek a retrospective opinion from Drs. Engel or Brayton because they did not begin treating plaintiff until well after 1983.  *See Roy*, 201 F.3d at 432.

Plaintiff did not meet her burden of proving that she suffered from her claimed disabilities prior to the expiration of her insured status on September 1983.  *See Janicki v. Astrue*, 2009 WL 3753911, at *2 (E.D.N.Y. 2009) (the ALJ's decision to terminate the sequential analysis at Step Two was supported by substantial evidence as plaintiff failed to establish that he suffered from an impairment that significantly limited his physical or mental ability to do basic work activity prior to the expiration of his insured status).  Accordingly, the Court finds that based upon the record, substantial evidence supports the ALJ's determination.

### III.   Jury Trial

Plaintiff has requested that the issues herein be heard by a jury.  Plaintiff is not entitled to a trial by jury because Congress has the "power to entrust enforcement of statutory rights to an administrative process or specialized court of equity free from the strictures of the Seventh Amendment."  *Wells v. Astrue*, 2008 WL 102828, at *7 (S.D.N.Y. 2008) (citing *Curtis v. Loether*, 415 U .S. 189, 195 (1974)).  A Court may not try a decision of the Secretary, *de novo* on review.

*Id.* (citing *Brown v. Finch*, 429 F.2d 80, 82 (5th Cir.1970)).  Congress delegated to the Commissioner the authority to make findings of fact when adjudicating claims for Social Security benefits with review by a court using the standard of substantial evidence.  *Id.* (citing 42 U.S.C. §§ 405(b)(1), 405(g), 1383(c)(1)(A), 1383(c)(3).  The Court is limited to a determination of whether the Secretary's decision was based upon substantial evidence.  *Haskin v. Sec'y of the Dep't of Health and Human Servs.*, 565 F.Supp. 984, 987 (D.C.N.Y. 1983) (citing 42 U.S.C. Section 504(b)).

## IV.    Survivor Benefits

Plaintiff claims that she intended to file a claim for disabled child insurance benefits and that the Social Security Administration erroneously analyzed and presented the case as a DIB claim.   Defendant argues that plaintiff's request for permission to file for such benefits must be denied under the doctrine of administrative *res judicata*.  Defendant claims that the ALJ's decision that plaintiff did not suffer from a disability prior to September 1983 necessarily precludes a finding that plaintiff was disabled prior to reaching age 22.

Section 202(d) of the Social Security Act provides:

> Child's insurance benefits
>
> (1) Every child . . . of an individual entitled to old-age or disability insurance benefits, or of an individual who dies a fully or currently insured individual, if such child–
>
> (A) has filed application for child's insurance benefits,
>
> (B) at the time such application was filed was unmarried and (i) either had not attained the age of 18 or was a full-time elementary or secondary school student and had not attained the age of 19, or (ii) is under a disability (as defined in section 423(d) of this title) which began before he attained the age of 22.

42 U.S.C. § 402.  Plaintiff must establish that she is a disabled adult whose parent was entitled to Social Security retirement benefits and that she may receive Social Security childhood disability benefits because she has been continuously disabled since before the age of 22 and was dependent on her parent. 42 U.S.C. § 402(d)(1)(B).  *Rossello ex rel. Rossello v. Astrue*, 529 F.3d 1181, 1182 (C.A.D.C. 2008).  The disability must be continuous from before age 22 until the claimant's application.  *Futernick v. Richardson*, 484 F.2d 647, 648 (6th Cir.1973). To determine whether an individual has been continuously disabled, the Social Security Administration first considers whether the individual's work activity since turning 22, if any, constitutes "substantial gainful activity"; if so, that disqualifies the claimant from benefits. 20 C.F.R. § 404.1520(a)(4)(i).   The Social Security Administration then considers the medical severity of the individual's impairment and whether the claimant has suffered from that impairment since before turning 22. § 404.1520(a)(4)(ii)-(v); see also § 404.1520a (relating to mental impairments).

"When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply *res judicata* to enforce repose." *Britton v. Astrue*, 2011 WL 2267587, at *11 (N.D.N.Y. 2011) (the plaintiff's application was for benefits was a duplicate of her prior applications and both applications presented essentially the same impairments and medical evidence) (citing *U.S. v. Utah Construction & Mining Co.*, 384 U.S. 394, 422(1966)). "Administrative *res judicata* applies if the Commissioner has made a previous determination or decision . . . about a claimant's rights on the same facts and on the same issue or issues, and this previous determination or decision has become final by either administrative or judicial action". *Willard v. Astrue*, 2011 WL 44990410, at * (S.D. Cal. 2011) (citing 20 C.F.R. 404.957(c)(1);

416.1457(c)(1)); *see also Malave v. Sullivan*, 777 F.Supp. 247, 251 (S.D.N.Y. 1991). In *Malave*,

the District Court for the Southern District of New York, discussing *res judicata*, reasoned:

> These rules provide that once a claim has been adjudicated by HHS and the claimant has pursued all the levels of appeal he wishes, that administrative determination is binding on the claimant as to that particular claim. See 20 C.F.R. §§ 404.957( c ) 416.1457( c ) (1991). Thus once a claimant has applied for benefits based on one set of facts, and that claim has been adjudicated as far as the claimant chose to pursue it, the Secretary's determination is binding and the Secretary can dismiss any future applications for benefits based on the same facts. The claimant, of course, remains free to pursue new claims.

*Malave*, 777 F.Supp. at 251.

At the commencement of the administrative hearing, plaintiff indicated that she intended

to file a claim, "for her father's Social Security". (T. 22).   The ALJ asked plaintiff if she had the

death certificate or her father's social security number and she stated that the information was "at

home".  (T. 22-23).   The ALJ confirmed that he did not have the aforementioned information and

stated, "[w]hat I have is an application for Disability Insurance Benefits on your behalf, under

your name, not under your father's".  (T. 24).   In the decision, the ALJ specifically discussed this

discrepancy:

> It should be noted that the claimant asserted at the hearing that it was her intention to file a claim a [sic] disabled adult child under her deceased father's social security number.  She claim that the Social Security Administration misunderstood and filed the wrong kind of claim.  Although the claim is not technically before me, I will discuss the merits of such a claim.  As required by section 202(d) of the Social Security Act, to be entitled to child's insurance benefits, the claimant must have a disability that began before attainment of age 22 which in this case would have been December 20, 1978.  As previously discussed, there is no medical evidence to support such a claim.  Additionally, the claimant did not have knowledge of necessary information to evaluate her father's earnings such as the social security number of her father or the date of his death.  (T. 15).

At the time that he rendered the decision, the ALJ did not have a copy of plaintiff's father's death certificate or his social security number.  Plaintiff subsequently provided that information with the complaint in this action.  In addition, as has been thoroughly discussed, the record did not include any medical records or opinions from any treating sources during the relevant time period, from birth to age 27 (1956-1983).

In this case, the only application before the ALJ and this Court involves plaintiff's claims for DIB benefits for the time period of 1956 through 1983.  All evidence in the administrative record concerns plaintiff's DIB claim.  This is the only claim that the agency considered and the only claim that has been adjudicated.  While the ALJ referred to plaintiff's intention to file a disabled child application and attempted to resolve the merits of said claim, he acknowledged that plaintiff, "did not have knowledge of the necessary information to evaluate her father's earnings such as the social security number of her father or the date of his death".  (T. 16).  Moreover, the ALJ specifically advised plaintiff during the hearing that the DIB claim was the only claim he was considering and confined all questions and testimony to that issue.  Indeed, plaintiff's statement at the commencement of the administrative hearing regarding her intention to file her claim as a disabled child, is the first record of any such claim.

Accordingly, this Court can not hold that plaintiff has had a full and fair opportunity to litigate a claim for disabled child benefits.  As to defendant's application that the Court apply *res judicata* to prevent any further filings, that application is premature.  The Court has reviewed the caselaw cited by defendant in support of the doctrine.  The cases cited involve facts and issues dissimilar to those presented herein.  Before this Court can make a determination regarding *res judicata*, the ALJ must apply the doctrine upon the presentation of the same facts and issues and a final administrative decision must be issued.  While defendant's request for judgment on the issue

21

of *res judicata* is not properly before this Court, defendant is not barred from raising the defense should plaintiff file future claims. Given plaintiff's *pro se* status, the Court is compelled to caution plaintiff that should she opt to proceed with further claims or applications based upon the same evidence presented herein, plaintiff will undoubtedly confront this issue.

## CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED**, that the decision denying disability benefits be **AFFIRMED**; and it is further

**ORDERED** that defendant's motion for judgment on the pleadings (Dkt. No. 16) is **GRANTED**; and it is further

**ORDERED** that plaintiff's complaint is **DISMISSED**; and it is further

**ORDERED** that pursuant to General Order # 32, the parties are advised that the referral to a Magistrate Judge as provided for under Local Rule 72.3 has been **RESCINDED**, as such, any appeal taken from this Order will be to the Court of Appeals for the Second Circuit, and it is further

**ORDERED** that the Clerk of Court enter judgment in this case.

**IT IS SO ORDERED.**

Dated:  February 23, 2012
        Albany, New York

Mae A. D'Agostino
U.S. District Judge

22